## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| SAUL KASSIN | : | Mag. No. 09-3610 |

I, Robert J. Cooke, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

From in or about June 2007 to in or about December 2008, in Monmouth County, in the District of New Jersey, and elsewhere, defendant SAUL KASSIN did:

> knowingly and willfully conspire with others to conduct and attempt to conduct financial transactions involving property represented to be the proceeds of specified unlawful activity, specifically, bankruptcy fraud and trafficking in counterfeit goods, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property believed to be proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3).

In violation of Title 18, United States Code, Section 1956(h).

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT A

continued on the attached page and made a part hereof.

*Robert J. Cooke*
Robert J. Cooke, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 21, 2009, at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

Attachment A

    I, Robert J. Cooke, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein, based upon my own participation in this investigation, as well as information provided to me by other law enforcement officers. Because this Attachment A is submitted for the limited purpose of establishing probable cause, I have not included herein the details of every aspect of this investigation. Statements attributable to individuals contained in this Attachment are related in substance and in part, except where otherwise indicated. All contacts discussed herein were recorded, except as otherwise indicated.

    1. Defendant Saul Kassin, a resident of Brooklyn, New York, is the Chief Rabbi of Sharee Zion, a synagogue located on Ocean Parkway in Brooklyn (hereinafter, "defendant KASSIN"). Defendant KASSIN operated a charitable tax-exempt organization in conjunction with his synagogue (hereinafter, "defendant KASSIN's Charitable Organization"). A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant KASSIN does not hold a license to transmit or remit money.

    2. At all times relevant to this Complaint:

    (a) There was a coconspirator named Edmond Nahum (hereinafter, "Coconspirator Nahum") who was the principal rabbi of Deal Synagogue, a synagogue located in Deal, New Jersey. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that Coconspirator Nahum does not hold a license to transmit or remit money;

    (b) There was an individual named Eliahu Ben Haim, a/k/a Eli Ben Haim (hereinafter, "Ben Haim") who was the principal rabbi of Congregation Ohel Yaacob, a synagogue located in Deal. Ben Haim operated several charitable tax-exempt organizations in conjunction with his synagogue, including one called Congregation Ohel Eliahu (hereinafter, "COE") and another called Friends of Yachave Da'at. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that Ben Haim does not hold a license to transmit or remit money; and

1

(c) There was a cooperating witness (the "CW") who had been charged in a federal criminal complaint with bank fraud in or about May 2006. Pursuant to the FBI's investigation and under its direction, the CW from time to time represented that the CW purportedly was engaged in illegal businesses and schemes including bank fraud, trafficking in counterfeit goods and concealing assets and monies in connection with bankruptcy proceedings.

3. On or about June 20, 2007, Coconspirator Nahum met with the CW in Coconspirator Nahum's office in Deal. During this meeting, Coconspirator Nahum received a check from the CW in the amount of $10,000 made payable to defendant KASSIN's Charitable Organization. The CW indicated that the funds from this check represented monies that the CW was owed by another individual, and that this other individual wished to launder the money through a charitable organization. The CW also informed Coconspirator Nahum that "the guy gave it to me because he wants a write off, like everybody else." Later in the conversation, Coconspirator Nahum described how he put checks through defendant KASSIN's Charitable Organization and would receive checks in return. When the CW noted that the people who had initially provided the checks to Coconspirator Nahum did so because "the people want the write offs," Coconspirator Nahum responded "[e]xactly." Coconspirator Nahum also confirmed that defendant KASSIN received many checks each day, prompting the CW to ask "hundreds of thousands a week, no?" Coconspirator Nahum replied "[a]t least - more," and noted that defendant KASSIN had a staff to help him with the accounting. Coconspirator Nahum also confirmed that defendant KASSIN charged a fee for moving checks through his charitable account, and did not disagree when the CW suggested that the fee would likely be a five to ten percent commission. Prior to the CW's departure, Coconspirator Nahum put the check the CW had provided to him into a stamped envelope to be mailed to "Rabbi Saul J. KASSIN," at an address in "Brooklyn, N.Y." Coconspirator Nahum also put within this envelope a stamped envelope addressed to the CW along with a note to return to the CW a check in the amount of $9,000 made payable to either a specified company - in reality, a fictitious company set up by the FBI for the purpose of enabling the CW to launder money represented to be the proceeds of illegal activities - or to one of Ben Haim's charitable organizations.

4. On or about June 26, 2007, Coconspirator Nahum received a phone call from the CW who asked Coconspirator Nahum if he knew "whether Rabbi Kassin got that check yet," a reference to the $10,000 check that the CW had provided to Coconspirator Nahum on or about June 20, 2007. Coconspirator Nahum informed the CW that

2

he had spoken with defendant KASSIN the same day that the CW had provided Coconspirator Nahum with the check and further stated that defendant KASSIN would mail the return check - expected to be a $9,000 check - to the CW's house. Coconspirator Nahum stated that he had told defendant KASSIN everything that the CW had told Coconspirator Nahum.

5. On or about June 27, 2007, Coconspirator Nahum met with the CW in Coconspirator Nahum's office in Deal. During the ensuing conversation, Coconspirator Nahum provided the CW with a check in the amount of $9,000 drawn upon the account of defendant KASSIN's Charitable Organization and made out, per the CW's request, to COE, a charitable organization operated by Ben Haim. After Coconspirator Nahum indicated that defendant KASSIN was "big," the CW asked "so if I have like, uh, you know, fifty thousand a month for the next three months, he can handle it, no problem?" Coconspirator Nahum responded that defendant KASSIN would be able to do so. The CW then asked Coconspirator Nahum "[i]f I give it to you, he'll do it right away?" Coconspirator Nahum replied "[y]eah, sure." The CW then asked, by way of clarification, "[t]hat's what he does?" Coconspirator Nahum responded simply, "[y]eah, that's what he does." Coconspirator Nahum also confirmed that defendant KASSIN charged a percentage for each of these deals.

6. On or about June 28, 2007, Coconspirator Nahum met with the CW during a meeting just outside of a location in Deal. During this meeting, Coconspirator Nahum accepted a bank check from the CW in the amount of $25,000 made payable to defendant KASSIN's Charitable Organization. Coconspirator Nahum agreed to deliver the check to defendant KASSIN as part of a money laundering transaction. Coconspirator Nahum was informed by the CW that the CW had a couple of hundred thousand dollars that "no one knows about," a reference to the bankruptcy proceedings from which the CW was purportedly hiding assets. Coconspirator Nahum was informed by the CW about this arrangement as follows: "what I do is, he give me, uh--I give you the check. Kassin give back a check to Ohel Eliahu. I'll give it to Eli [Ben Haim], and Eli give me back the [money]." Coconspirator Nahum responded "[n]o problem," adding "[a]s long as they don't ask questions." The CW explained that this arrangement allowed for the CW's silent partner to get a tax write off, and enabled defendant KASSIN and Ben Haim to earn a ten percent fee. The CW added that by hiding this money from the bankruptcy court, "[t]his way I can live. I have no problems." Coconspirator Nahum agreed to have a check

3

made out for the CW from defendant KASSIN's Charitable Organization made payable to COE in the amount of $22,500.[1]

7. On or about August 8, 2007, Coconspirator Nahum and the CW met in Coconspirator Nahum's office in Deal. During the ensuing meeting, Coconspirator Nahum received three bank checks from the CW. One of those checks was a $50,000 check made payable to defendant KASSIN's Charitable Organization to be provided by Coconspirator Nahum to defendant KASSIN. When handing this check to Coconspirator Nahum, the CW explained that "[t]his one is, uh, [defendant KASSIN's Charitable Organization], the top one for fifty. So let me, get me back forty-five thousand." After accepting the checks, Coconspirator Nahum expressed concern that a woman had called recently from the bank, but the CW reassured Coconspirator Nahum by stating "[t]his is from my partner that doesn't know nothing where the money's even going 'cause, you know, I can't -- the bankruptcy-- this, that -- nobody can know anything." The CW indicated to Coconspirator Nahum that the CW was trying to get "the money around the courts so nobody knows anything," another allusion to the bankruptcy fraud which was the proffered reason why the CW wished to launder these funds. The CW further stated that "I don't go into the bank, it's, uh, my partner who, uh -- I don't show up anywhere [u/i] on any paper. My name's nowhere, so there's no, uh -- they don't know who I am." After the CW reiterated that defendant KASSIN would retain $5,000 as his fee for the $50,000 check, Coconspirator Nahum again expressed his concern by stating "[n]o problem for sure?" The CW replied "I don't say anything to nobody. You don't say anything to anybody, and that's it," prompting Coconspirator Nahum to remark by way of agreement, "[n]o, that's what I'm saying."

8. On or about August 13, 2007, Coconspirator Nahum met with the CW in Coconspirator Nahum's office in Deal. At the outset of the meeting, Coconspirator Nahum gave the CW a $45,000 check drawn from defendant KASSIN's Charitable Organization,

---

[1] Subsequently, on or about July 2, 2007, the CW met with Ben Haim who provided the CW with approximately $20,250 in cash in expectation that the CW would return with a check from defendant KASSIN's Charitable Organization in the amount of $22,500. Two days later, the CW met with Ben Haim at Ben Haim's office in Deal at which time the CW gave Ben Haim the $22,500 drawn from KASSIN's Charitable Organization and made payable to COE. This completed the money laundering transaction which had begun on June 27, 2007, when the CW had given Coconspirator Nahum the check in the amount of $25,000.

4

causing the CW to note that "[t]his is from Rabbi Kassin, forty five." Coconspirator Nahum recommended waiting a few days to let this check clear. When the CW mentioned that the CW would contact Coconspirator Nahum the next week for additional business, Coconspirator Nahum reminded the CW that he could only do deals of $5,000 or less when using his own charitable organizations. Coconspirator Nahum recommended that large amounts be moved through defendant KASSIN, noting that "KASSIN is the best." Coconspirator Nahum further suggested that the CW should spread out the money that the CW wished to launder through a number of rabbis, stating that "I think it's better. You, you know why? The more it's spread is better [u/i]," prompting the CW to reply "[y]eah, no, no question. This way no one can see anything." To this end, Coconspirator Nahum recommended that the CW turn to another money launderer, Rabbi Mordchai Fish, noting that "even through Fish, even though [u/i] complicated." Coconspirator Nahum further opined that Rabbi Fish "can do million dollars . . . under the ground." When the CW complained that Rabbi Fish was unreliable, Coconspirator Nahum countered that "Fish is good . . . Promise him something."

    9.    On or about October 24, 2007, the CW met with defendant KASSIN at defendant KASSIN's residence in Brooklyn. During the meeting which followed, defendant KASSIN accepted from the CW a $25,000 bank check drawn upon an account based in New Jersey. When handing the check to defendant KASSIN, the CW stated that "[t]his is a, uh, check, a bank check to [defendant KASSIN's Charitable Organization] for twenty-five thousand." Defendant KASSIN further was informed by the CW that the check "is from some partnerships that I have with people where I'm not -- I don't show up too much." The CW further explained the CW's efforts to shield this money from the ongoing bankruptcy proceedings in which the CW was embroiled, stating "it's a partnerships that I have, uh, but I don't want, you know, because of the bankruptcy, I don't want anyone to know. This way it goes to the, to that guy. This way there's no problems with anything. No, I did a few times with Coconspirator Nahum with you before, you know." Defendant KASSIN retrieved a large volume from another room and began to write out a check from his Charitable Organization to the CW. The CW stated that "ten percent is for, uh, you, and then ninety percent back to -- I need a check back to Eli Ben Haim -- Congregation Ohel Eliahu, please." Defendant KASSIN asked for the CW's name and telephone number, and the CW stated "[t]wenty-two thousand five hundred to Congregation Ohel Eliahu." Defendant KASSIN then asked "[h]ow much for [u/i] [my Charitable Organization]?" The CW explained "ten percent for them, and twenty-two thousand . . ." Defendant KASSIN interjected, "two thousand five hundred, you mean," reflecting

the amount of the fee that he would realize for laundering the CW's $25,000 check. The CW replied "[y]eah, yeah," and clarified "[a]nd then the check back will be twenty-two thousand five hundred for Eli Ben Haim." Defendant KASSIN inquired "[i]s that tax deductible," a reference to Ben Haim's charitable organization, COE, prompting the CW to answer in the affirmative. Defendant KASSIN then asked "[w]hy don't you go to [Ben Haim]?" The CW explained that "I did a lot of business with him already. I don't want too many checks to him, you know. It doesn't look good, so. He has a lot of business. Eli is too big. He's doing too much business, this guy" -- a reference to the large volume of money laundering being conducted by Ben Haim with the CW and other customers. Defendant KASSIN again asked about the partnerships in which the CW was involved, prompting the CW to explain that "I don't show up on the paperwork because I don't need to show up. I need to keep everything quiet now." The CW added that "[s]o it's uh, [u/i] make a donation and then, uh, check to Eli. This way there's no trace or anything." The CW referred to the CW's ongoing bankruptcy proceedings and added "I have to live you know. This way, I give ten percent and then on ninety percent I'm able to survive . . . ." Defendant KASSIN completed writing out the check in the amount of $22,500 and gave the CW the check. As the CW departed, defendant KASSIN was informed by the CW that the CW might have additional money that the CW wished to move through defendant KASSIN. Approximately one week later, on or about October 31, 2007, the CW provided the $22,500 check from defendant KASSIN's Charitable Organization to Ben Haim who, in return, provided the CW with $22,500 in cash.

10. On or about December 20, 2007, the CW met with defendant KASSIN at defendant KASSIN's residence in Brooklyn. During the ensuing meeting, defendant KASSIN accepted a bank check from the CW made payable in the amount of $25,000 to defendant KASSIN's Charitable Organization. By way of explanation as to the source of funds from this check, the CW stated that "I have a, uh, company here in New York. I don't have my name -- I have partners, and we make handbags, pocketbooks, this and that . . ." The CW added that "[w]e take handbags, and we put on different labels like Prada, Gucci and stuff, uh -- they're false labels." During the meeting, defendant KASSIN again broke out a large volume, apparently a ledger relating to his Charitable Organization. Defendant KASSIN asked to whom the check should be made payable, and the CW stated "Ohel Eliahu." Defendant KASSIN again asked why the CW did not simply write out the check directly to one of Ben Haim's charitable organizations, and the CW stated "[b]ecause I do too much business with him." The CW assured defendant KASSIN that the bank check that the CW was providing was valid, and stated

6

"[a]nd then twenty-two thousand five hundred back, you know, please, and the rest is for you." The CW then explained that Ben Haim would give the CW cash in return for the check from defendant KASSIN. Defendant KASSIN asked whether the CW would prefer two checks, but the CW stated that one check would be sufficient. Defendant KASSIN gave the CW a $22,500 check drawn upon his Charitable Organization. Before departing, the CW reiterated that the CW and the CW's partner made "cheap stuff" on which they put "fake labels." The CW provided this check to Ben Haim the following day, at which time Ben Haim gave the CW approximately $15,250 in cash as partial payment for this money laundering transaction.

    11. On or about February 12, 2008, the CW met with defendant KASSIN at defendant KASSIN's residence in Brooklyn. When the CW arrived, the CW was greeted at the door by an individual from Deal who told the CW that "I brought him some checks for the, um for the charitable [u/i]." When the CW walked into the dining room, three individuals were present, including the individual from Deal as well as a relative of defendant KASSIN who was seated at the table. These individuals appeared to be writing various checks to and from defendant KASSIN's Charitable Organization. The CW overheard a third individual, an unidentified male of Israeli descent, tell defendant KASSIN in Hebrew that he needed a check back for the envelope of checks he had brought with him. Defendant KASSIN told this individual to write down what was in the envelope and how much he needed in return and instructed this individual to return in an hour to pick up the check. Defendant KASSIN then escorted the CW into another room, where he told the CW that "I am very careful now [u/i]." The CW assured defendant KASSIN that "[t]his is a small one, this one, this is only 25,000," a reference to the bank check in the CW's possession in the amount of $25,000. Defendant KASSIN asked why the CW needed a check from defendant KASSIN's Charitable Organization, and the CW explained that "I can't, uh, make money because, uh, I'm in bankruptcy now. . . . I need money. I have to live, so . . . and I get cash. Eli Ben Haim gives me cash for my company." Defendant KASSIN inquired further about this company, prompting the CW to state "I have a company. I don't show up on paper," and further described himself as a "silent partner." The CW further explained that "any time that we make money, they give me a bank check and then I -- you give me a check back -- like for this one would be for twenty thousand five hundred, and then Eli Ben Haim gives me the cash [u/i] I'm able to survive until the bankruptcy, uh, is finished." Defendant KASSIN expressed concern about the check should anyone "ever come ask me 'what's this, this money that you're taking.'" The CW assured defendant KASSIN that "it doesn't come back to me.

7

My name, my name is nowhere." Defendant KASSIN then asked about the CW's company from which the proceeds of the CW's $25,000 check had been generated, and the CW replied by referring to it as a company that "makes the stuff, and then we switch the labels and we have Gucci and Prada . . . and we're making money." The CW further allayed defendant KASSIN's concerns by stating that "I just have to get it around the bankruptcy . . . and then Eli Ben Haim always has a lot of cash for me." Defendant KASSIN again asked why the CW did not simply go directly to Ben Haim with the check, but the CW stated that the CW had already moved 600 to 700 thousand dollars through Ben Haim directly and "I don't want to do too much to one organization in case anyone looks." After this exchange, the CW stated that the CW wished to have a check made payable to COE in the amount of $22,500. Defendant KASSIN proceeded to write out a check made payable to COE. Defendant KASSIN asked for the CW's address which he wrote down, and gave the CW the check. The CW left, stating that "I'll give this to Eli." The CW provided this check to Ben Haim upon the latter's return from Florida on February 24, 2008, in return for which Ben Haim provided the CW with $20,500 in cash.

12. On or about July 22, 2008, defendant KASSIN met with the CW at a residence in Deal where defendant KASSIN was residing during the summer months. During the meeting, defendant KASSIN accepted a bank check in the amount of $25,000 made out to defendant KASSIN's Charitable Organization. The CW explained, first referring to the bank fraud for which the CW had been charged in May 2006, that "this is, uh, a check, just like all the other ones from the—no, this is the profits from the [bank]--my deal--and then the labels from my new--from my company." The CW explained that the company "stitch[es] labels on the -- Prada and Gucci." In exchange, defendant KASSIN provided a check in the amount of $22,500 made out to Friends of Yachave Da'at, a charitable organization operated by Ben Haim and another individual.

13. On or about December 15, 2008, the CW met with defendant KASSIN at defendant KASSIN's residence in Brooklyn. During the meeting, the CW explained that a prior laundering deal with defendant KASSIN, which had been arranged through Coconspirator Nahum, had resulted in the check back to the CW as it had been improperly filled out. Defendant KASSIN retrieved two check ledger books and handed the CW a new check for $22,500. As defendant KASSIN was recording this transaction and writing out the replacement check, the CW explained that "I have a handbag business," and indicated that the check was derived from money from that business. The CW further explained that "[w]e make handbags, pocketbooks, and, uh, you know, they, they sell

the fancy ones for $2,000. We make the ones they look the same - we sell them for $120. That business is good. You know, they copy them."

    14.    Between approximately June 2007 and December 2008, defendant KASSIN engaged in money laundering transactions with the CW totaling more than $200,000 in funds represented by the CW to involve the proceeds of criminal activities.